## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

NICOLE GUTIERREZ,

     Plaintiff,

v.                                                                    Civ. No. 21-984 KK/GJF

JOHNSON & JOHNSON
INTERNATIONAL, INC.,

     Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on: (1) Defendant['s] Motion to Dismiss (Doc. 10) ("First Motion to Dismiss"), filed November 12, 2021; (2) Defendant's Motion to Dismiss Plaintiff's First Amended Complaint for Declaratory, Injunctive, and Monetary Relief (Doc. 24) ("Second Motion to Dismiss"), filed January 21, 2022; (3) Plaintiff's Motion for Leave to File Plaintiff's First Amended Complaint (Doc. 30) ("Motion to Amend"), filed February 28, 2022; and, (4) Plaintiff's Motion to Set a Hearing Date (Doc. 38) ("Motion for Hearing"), filed April 29, 2022. Having reviewed the parties' submissions, the record, and the relevant law and being otherwise sufficiently advised, the Court ORDERS that:  (1) Defendant's First Motion to Dismiss is DENIED AS MOOT; (2) Defendant's Second Motion to Dismiss is GRANTED IN PART and DENIED AS MOOT IN PART; (3) Plaintiff's Motion to Amend is GRANTED IN PART and DENIED IN PART; (4) Plaintiff's First Amended Complaint for Declaratory, Injunctive, and Monetary Relief (Doc. 18) ("FAC") is stricken; (5) Plaintiff is granted leave to refile the FAC with the modifications described below; and, (6) Plaintiff's Motion for Hearing is DENIED.

## I. __Factual Background and Procedural History__

In her original complaint, Plaintiff Nicole Gutierrez alleged the following. Plaintiff is the court-appointed guardian and conservator for her brother, Juan D. Baca. (Doc. 1-1 at 7, 9, 12.) Mr. Baca's wife, Lisa Baca, was an employee of Defendant Johnson & Johnson International, Inc. ("J&J International") and former Defendant Johnson & Johnson, Incorporated ("J&J Inc.") (collectively, "J&J Defendants"), from 1988 until her death in 1994. (*Id.* at 8-9.) Ms. Baca designated Mr. Baca as the survivor beneficiary of the retirement plan ("Plan") in which she participated as a benefit of her employment with the J&J Defendants. (*Id.*) Mr. Baca has a long history of cognitive disabilities, which worsened after Ms. Baca's death. (*Id.*)

On September 29, 1995, the J&J Defendants sent Mr. Baca a letter informing him that he was entitled to receive monthly payments of $107.91 under the Plan beginning in December 2015. (*Id.* at 9, 23.) The letter stated that "[p]ayments will begin as of December 1, 2015 and will continue for the remainder of your lifetime," and informed Mr. Baca that he or his "authorized representative" could request a review of "the benefit awarded to [him]" within 60 days by calling the Johnson & Johnson Benefit Service Center ("J&J BSC"). (*Id.* at 23.) The letter was printed on letterhead indicating that it came from the J&J BSC in Philadelphia, Pennsylvania. (*Id.*)

The state district court appointed Plaintiff and Mr. Baca's daughter as Mr. Baca's co-guardians on or about January 30, 2013. (*Id.* at 9, 24-26.) The order of appointment included references to Mr. Baca's finances; for example, the court found that there were "no available and adequate alternatives suitable … for the [e]ffective management" of Mr. Baca's "property and financial affairs," and ordered that the co-guardians' decisions "shall take precedence over decisions of any … financial agent, attorney in fact, or other surrogate or agent appointed by [Mr. Baca]." (*Id.*) The order further provided that "Letters of Guardianship shall issue upon acceptance

of the appointment."[1] (*Id.* at 25.)

Plaintiff "contact[ed]" the J&J Defendants "for the first time on or about December 21, 2015[,] to obtain more information" about Mr. Baca's benefits "and determine what was needed for distribution to start." (*Id.* at 10.) She advised the J&J Defendants of Mr. Baca's disability and her status as his guardian and requested accommodations. (*Id.*) At the J&J Defendants' request, Plaintiff faxed "supporting documentation" to the J&J BSC on January 5, 2016. (*Id.*) On January 28, 2016, the J&J Defendants sent Mr. Baca a "Pension Plan Federal Tax Withholding/Direct Deposit Form," requesting that he complete and return it to the J&J BSC. (*Id.* at 10, 30.) In response, Plaintiff made "multiple attempts" to explain to the J&J Defendants that Mr. Baca was "unable to complete the proper forms on his own"; however, they were "unwilling to accommodate [Mr. Baca's] disability." (*Id.* at 10-11.)

At the J&J Defendants' direction, Plaintiff "submit[ted] a Power of Attorney form" on April 7, 2016. (*Id.* at 11.) She also submitted a copy of the order appointing her as Mr. Baca's guardian. (*Id.*) On April 8, 2016, the J&J Defendants sent Mr. Baca a Power of Attorney Denial Notice ("Denial Notice") denying Plaintiff "access to [Mr. Baca's] Health and Welfare Plan(s) and/or Retirement Plan(s) at this time." (*Id.* at 11, 31.) In the notice, the J&J Defendants explained that Plaintiff and Mr. Baca's daughter

> were appointed co-guardians, which only authorizes the co-guardians to make decisions to ensure that the Principal's basic needs are met and make life decisions. Based upon the documentation we were provided, neither [Plaintiff] nor [Mr. Baca's daughter] were appointed conservator of the Principal, which would have enabled them to access the Principal's J&J benefit accounts.

---

[1] As submitted by counsel, the court's order included six references to a "conservator," "conservators," or "conservatorship"; however, the court struck all but one of these references by hand. (Doc. 1-1 at 24-26.) The surviving reference provides that "an appointment of a guardian and conservator is necessary and desirable as a means of providing continuing care, supervision and rehabilitation, of the person of [Mr. Baca] and of [e]ffectively managing property and financial affairs." (*Id.* at 24.)

3

(*Id.* at 31.) The notice informed Mr. Baca that if he "need[ed] additional information," he should "access the Your Benefits Resources™ Web site" or call the J&J BSC. (*Id.*) The notice was printed on letterhead indicating that it came from "Johnson & Johnson" in Lincolnshire, Illinois. (*Id.*)

On November 14, 2016, the state district court issued Letters of Guardianship evidencing Plaintiff's guardianship of Mr. Baca.[2] (*Id.* at 11-12, 32-33.) The Letters stated that Plaintiff

> shall have plenary power pursuant to New Mexico law to independently act on behalf of [Mr. Baca], for all purposes related to [Mr. Baca's] custody, care, health, safety, finances, including medical decisions, medical treatment and admission into facilities if found appropriate by facility, to include but not limited to her, financial decisions and care as outlined by NMSA, Section 45-5-312(B)(4).[3]

(*Id.* at 11-12, 33.) Nevertheless, the J&J Defendants "forced" Plaintiff to reopen the guardianship case to seek appointment as Mr. Baca's conservator. (*Id.* at 12.) The court appointed Plaintiff as Mr. Baca's conservator on January 31, 2017, and issued Letters of Plenary Conservatorship on February 9, 2017. (*Id.*)

---

[2] The Court takes judicial notice of the state district court docket indicating that Plaintiff accepted appointment as Mr. Baca's guardian on October 13, 2016, and that the court terminated Mr. Baca's daughter's co-guardianship on November 9, 2016. *In re Juan Baca*, Case No. D-202-PQ-2012-00067 (2nd Jud. Dist. Ct., Bernalillo Cty., N.M.); *see Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (courts may take judicial notice of public records in deciding Rule 12(b)(6) motion).

[3] N.M. Stat. Ann. § 45-5-312(B)(4) states in pertinent part that,

> if no conservator for the estate of the protected person has been appointed, if the court has determined that a conservatorship is not appropriate and if a guardian appointed by the court has been granted authority to make financial decisions on behalf of the protected person in the order of appointment and in the letters of guardianship …, the guardian has … the power: (a) to institute proceedings to compel any person under a duty to support the protected person or to pay sums for the welfare of the protected person to perform that duty; (b) to receive money and tangible property deliverable to the protected person and apply the money and property for support, care and education of the protected person … ; (c) to serve as advocate and decision maker for the protected person in any disputes with persons or organizations, including financial institutions, regarding the protected person's finances; [and,] (d) to obtain information regarding the protected person's assets and income from persons or organizations handling the protected person's finances[.]

N.M. Stat. Ann. § 45-5-312(B)(4)(a)-(d).

Plaintiff was also "forced to retain legal representation to prepare a [d]emand [l]etter" to the J&J Defendants. (*Id.*) On August 2, 2017, counsel mailed the demand letter to three addresses, including the Lincolnshire, Illinois address on the Denial Notice, the J&J BSC in Orlando, Florida, and the Johnson & Johnson "Main Office" in Neenah, Wisconsin. (*Id.* at 12, 34.) The letter "formally demand[ed] the expedited release of all funds" to which Mr. Baca was entitled[4] and indicated that "[i]f any outstanding documentation is still required," counsel would "help facilitate that process." (*Id.* at 34.) The letter also requested attorney's fees and costs in the amount of $5,870. (*Id.* at 36.) It reiterated that Mr. Baca is disabled, requested accommodations, and referenced attached exhibits. (*Id.* at 12, 34-36.) The J&J Defendants never responded to counsel's August 2017 demand letter. (*Id.* at 12.)

For the next several years, Plaintiff worked on other matters related to Mr. Baca's care and maintenance. (*Id.* at 12-13.) Then, on June 8, 2021, Plaintiff's counsel's office contacted the J&J BSC to "determine the best course of action" for having Mr. Baca's benefits "addressed expeditiously." (*Id.* at 13.) Following the J&J BSC's instructions, counsel's office faxed another demand letter to the J&J Defendants on June 22, 2021, and on June 23, 2021, called to request that a "Ticket" be opened with "the Escalation Team." (*Id.*) The J&J Defendants' representative "advised that everything appeared to be in order and that J&J would reach out to discuss next steps once the faxed documentation had been fully processed." (*Id.* at 13-14.)

On July 8, 2021, Plaintiff's counsel's office called the Escalation Team to follow up and was told the Ticket had been closed that day. (*Id* at 14.) The Escalation Team representative stated that, per policy, a letter regarding the J&J Defendants' decision would be mailed to Plaintiff within

---

[4] Specifically, the letter requested $2,266.11 in retroactive benefits and continuing monthly benefits thereafter. (Doc. 1-1 at 36.)

15 days. (*Id.*) However, Plaintiff never received such a letter, and neither she nor Mr. Baca has ever received any Plan benefits from the J&J Defendants. (*Id.*)

Plaintiff filed her original complaint in state court on September 3, 2021. (*Id.* at 7.) In the complaint, Plaintiff asserted claims for breach of contract, negligence, negligent and fraudulent misrepresentation, and violations of the New Mexico Unfair Trade Practices Act and the Americans with Disabilities Act ("ADA"). (*Id.* at 16-20.) Based on these claims, she sought compensatory, treble, and punitive damages, attorney's fees and costs, and pre- and post-judgment interest. (*Id.* at 20-21.) On September 15, 2021, Plaintiff voluntarily dismissed J&J Inc. from the case, leaving J&J International as the only remaining Defendant. (Doc. 1-5 at 2.)

On October 8, 2021, Defendant J&J International removed the matter to this Court pursuant to 28 U.S.C. § 1331. (Doc. 1 at 1-8.) Defendant filed its First Motion to Dismiss in lieu of an answer on November 12, 2021, and Plaintiff responded in opposition to the motion on December 15, 2021. (Docs. 10, 17.)

On December 21, 2021, Plaintiff filed her FAC "to remedy defects in the [c]omplaint originally filed in state court." (Doc. 18; Doc. 30 at 2.) The FAC includes the same factual allegations as Plaintiff's original complaint,[5] (*compare* Doc. 1-1 at 7-45 *with* Doc. 18), and adds the following. At all relevant times, Defendant has been a fiduciary, sponsor, and named administrator of the Plan. (Doc. 18 at 2.) In a section entitled "Your Rights Under ERISA," the Summary Plan Description ("SPD") attached to Defendant's First Motion to Dismiss provides that

> if you request a copy of plan documents or the latest annual report from the plan
> and do not receive them within 30 days, you may file suit in a Federal court. In such
> a case, the court may require the plan administrator to provide the materials and

---

[5] However, the allegations in the FAC are limited to Defendant J&J International. (*Compare* Doc. 1-1 at 7-45 *with* Doc. 18.)

> pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator.[6]

(*Id.* at 11; *see* Doc. 10-1 at 51-52.) Mr. Baca "is entitled to $110.00 per day from December 1, 2015, but no later than August 2, 2017, through November 12, 2021, per the terms of J&J's SPD contract." (Doc. 18 at 11.)

The SPD also provides that, "[i]f you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court." (*Id.*; *see* Doc. 10-1 at 52.) Defendant instructed Plaintiff

> to seek a claim for benefits via letters which were directed to be sent through fax and mail. However, Defendant denied Plaintiff her rights to request benefits on behalf of [Mr. Baca], and thereafter, became completely unresponsive. Therefore, Plaintiff exhausted all administrative remedies provided to Plaintiff by Defendant and per the terms of [the Plan], Plaintiff was within her right to seek judicial relief.

(*Id.* at 14.)

After Plaintiff filed this lawsuit, her counsel tried to send "a written Claim for Benefits" to the J&J BSC in Dallas, Texas, at "the address specified in the [SPD]." (*Id.* at 12; Doc. 18-10 at 1.) The claim was dated December 17, 2021, but was not sent on that date because the SPD provided an invalid address—"P.O. Box 66103" instead of "P.O. Box 661103." (Doc. 18 at 12; Docs. 18-10, 18-11.) Plaintiff's counsel subsequently obtained the valid address and mailed the claim on December 20, 2021. (Doc. 18 at 12; Docs. 18-10, 18-11.)

The FAC includes seven counts. (Doc. 18 at 13-20.) In Count I, Plaintiff asserts a claim for benefits under Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA").[7]

---

[6] Earlier in the same section, the SPD explains that participants have the right, "upon written request to the plan administrator," to obtain "copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements," "the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor," and an "updated summary plan description." (Doc. 10-1 at 51.)

[7] In text, courts frequently refer to Section 502 by its original statutory designation rather than its designation in the United States Code, and as such, this Court will do the same. *See, e.g.*, *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 102 (2013); *CIGNA Corp. v. Amara*, 563 U.S. 421, 425 (2011).

(*Id.* at 13-14); 29 U.S.C. § 1132(a)(1)(B). In Counts II and III, she asserts claims for breach of fiduciary duty under ERISA Section 502(a)(3), based on Defendant's alleged failure to administer the Plan in accordance with applicable law, misleading representations, and failure or refusal to communicate with her. (*Id.* at 14-16); 29 U.S.C. § 1132(a)(3). Count IV sets forth a claim for failure to provide an adequate claims procedure and notice under ERISA 29 U.S.C. § 1133. (*Id.* at 16-17.) In Count V, Plaintiff asserts an ADA claim; and finally, in Counts VI and VII, she claims entitlement to declaratory and injunctive relief. (*Id.* at 17-20.)

Based on these claims, Plaintiff seeks:  (1) a declaration that Defendant has violated ERISA and the Plan terms and has breached its fiduciary duties; (2) a declaration that Plaintiff has a right to receive monthly benefits under the Plan; (3) payment of monthly benefits beginning December 1, 2015; (4) $110 per day from December 1, 2015 to November 12, 2021; (5) reformation of the Plan such that Plaintiff is eligible to receive benefits as Mr. Baca's guardian and conservator; (6) "other appropriate equitable relief," including "surcharge, restitution, prejudgment interest, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendant"; (7) compensatory and punitive damages; and, (8) attorney's fees and costs. (*Id.* at 20-21.)

Defendant filed its Second Motion to Dismiss the FAC, as well as a reply in support of its First Motion to Dismiss the original complaint, on January 21, 2022. (Docs. 24, 25.) On February 28, 2022, Plaintiff responded to Defendant's Second Motion to Dismiss, and also filed her Motion to Amend seeking leave to file the FAC. (Docs. 29, 30.) Defendant replied in support of its Second Motion to Dismiss and responded in opposition to Plaintiff's Motion to Amend on March 31, 2022; and, Plaintiff replied in support of her Motion to Amend on April 13, 2022. (Docs. 35-37.)

## II. <u>Analysis</u>

### A.    **Legal Standards**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted); *Walker v. Mohiuddin*, 947 F.3d 1244, 1248-49 (10th Cir. 2020). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Walker*, 947 F.3d at 1249. "The complaint does not need detailed factual allegations, but the factual allegations must be enough to raise a right to relief above the speculative level." *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1234 (10th Cir. 2020).

In determining whether a complaint states a plausible claim to relief, courts "accept as true all well-pleaded factual allegations in [the] complaint and view these allegations in the light most favorable to the plaintiff." *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (quotation marks omitted). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not count as well-pleaded facts." *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quotation marks omitted).

"In evaluating a motion to dismiss," courts may consider not only the factual allegations in the complaint, "but also the attached exhibits and documents incorporated into the complaint by reference." *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011). Courts may also consider documents not attached to or specifically incorporated into the complaint if the complaint refers to the document, the document is central to the plaintiff's claim, and the defendant submits an indisputably authentic copy. *Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999); *Hill v. Vanderbilt Capital Advisors, LLC*, 834 F. Supp. 2d 1228, 1247 (D.N.M. 2011). Finally, on a Rule 12(b)(6) motion, courts may take judicial notice of

appropriate facts and records. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006); *Hill*, 834

F. Supp. 2d at 1247.

> Federal Rule of Civil Procedure 15 provides that a party may amend its pleading
>
> once as a matter of course within … 21 days after serving it, or … if the pleading
> is one to which a responsive pleading is required, 21 days after service of a
> responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or
> (f), whichever is earlier.

Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing

party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Whether to grant leave to

amend is within the trial court's discretion. *Bradley v. Val-Mejias*, 379 F.3d 892, 900-01 (10th Cir.

2004) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "The court should freely give leave

when justice so requires," and should be mindful that Rule 15 is intended to provide litigants with

"the maximum opportunity for each claim to be decided on its merits rather than on procedural

niceties." Fed. R. Civ. P. 15(a)(2); *Minter v. Prime Equip. Co*., 451 F.3d 1196, 1204 (10th Cir.

2006). Nevertheless, courts may deny leave to amend on "a showing of undue delay, undue

prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by

amendments previously allowed, or futility of amendment." *Duncan v. Manager, Dep't of Safety,*

*City & Cty. of Denver,* 397 F.3d 1300, 1315 (10th Cir. 2005).

A proposed amended pleading is futile if "[it] would be subject to dismissal." *In re*

*Thornburg Mortg., Inc. Sec. Litig*., 265 F.R.D. 571, 580 (D.N.M. 2010) (citing *Bradley*, 379 F.3d

at 901). "The futility question is functionally equivalent to the question whether a complaint may

be dismissed for failure to state a claim." *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999);

*see also Childs v. Unified Life Ins. Co.*, 781 F. Supp. 2d 1240, 1251 (N.D. Okla. 2011) ("[T]o

determine whether a proposed amendment is futile, the court must analyze the proposed

amendment as if it were before the court on a motion to dismiss pursuant to Rule 12(b)(6).")

(brackets omitted). "The burden of showing futility rests with the [party] who assert[s] this ground in opposing … leave to amend." *Martin Marietta Materials, Inc. v. Kansas Dep't of Transp.*, 953 F. Supp. 2d 1176, 1181 (D. Kan. 2013), *aff'd*, 810 F.3d 1161 (10th Cir. 2016). The Court will consider the parties' pending motions in light of the foregoing standards.

**B.    The Court will deny Defendant's First Motion to Dismiss as moot.**

In its First Motion to Dismiss, Defendant asks the Court to dismiss Plaintiff's original complaint for failure to state a claim under Rule 12(b)(6). (Doc. 10 at 1, 15.) After Defendant filed the motion, Plaintiff filed her FAC "to remedy defects" in the original complaint and her Motion to Amend seeking leave to file the FAC. (Doc. 18; Doc. 30 at 1-2.) In so doing, Plaintiff has conceded that the original complaint was defective and demonstrated her intent to proceed on the claims in the FAC. Defendant's First Motion to Dismiss challenging the viability of the original complaint is therefore moot and the Court will deny it as such.

**C.    The Court will strike the FAC because Plaintiff was not entitled to file it as a matter of course under Rule 15(a)(1).**

In its Second Motion to Dismiss, Defendant first asks the Court to strike the FAC as improvidently filed. (Doc. 24 at 1, 5-6; Doc. 36 at 1-3.) In support, Defendant argues that Plaintiff was not entitled to file the FAC as a matter of course under Rule 15(a)(1). (*Id.*) Plaintiff counters that Rule 15(a)(1) authorized her to file the FAC without Defendant's consent or the Court's leave because Defendant had not filed a "responsive pleading" to the original complaint when she did so. (Doc. 29 at 4.) As explained below, Plaintiff is mistaken.

Rule 15(a)(1) permits a party to amend a pleading to which a responsive pleading is required once as a matter of course within "21 days after service of a responsive pleading *or* 21 days after service of a motion under Rule 12(b), (e), or (f), *whichever is earlier*." Fed. R. Civ. P. 15(a)(1)(B) (emphases added). In lieu of an answer, Defendant filed its First Motion to Dismiss

Plaintiff's original complaint under Rule 12(b)(6) on November 12, 2021. (Doc. 10.) Under Rule 15(a)(1), Plaintiff had until December 3, 2021, to amend the original complaint as a matter of course but did not file her FAC until December 21, 2021. (Doc. 18.) Thus, Plaintiff did not timely file the FAC under Rule 15(a)(1).

Plaintiff suggests that she was entitled to an extension of time to file the FAC as of right because the parties agreed to extend the time to file other pleadings, including Defendant's First Motion to Dismiss and Plaintiff's response to that motion. (Doc. 29 at 3-4; *see* Docs. 4, 13, 15.) The Court assumes without deciding that parties may independently agree to extend the time to file an amended pleading as a matter of course under Rule 15(a)(1). However, Plaintiff does not allege that Defendant agreed to such an extension and Defendant affirmatively denies that it did so. (Doc. 29 at 3-4; Doc. 36 at 2.) The Court therefore finds that Plaintiff was not entitled to file her FAC as a matter of course under Rule 15(a)(1), and will grant the portion of the Second Motion to Dismiss asking the Court to strike the FAC as improvidently filed.

**D.   The Court will allow Plaintiff to refile the FAC with modifications under Rule 15(a)(2).**

However, the Court will grant Plaintiff leave to refile the FAC with the modifications discussed below under Rule 15(a)(2). In her Motion to Amend, Plaintiff asks the Court for leave to file the FAC. (Doc. 30.) Defendant opposes the motion on grounds of futility. (Doc. 35.) In other words, Defendant asserts that the FAC would be subject to dismissal for failure to state a claim.[8] (*Id.*); *see In re Thornburg Mortg., Inc. Sec. Litig.*, 265 F.R.D. at 580 (proposed amended pleading

---

[8] Likewise, in its Second Motion to Dismiss, Defendant asserts that the Court should in fact dismiss the FAC for failure to state a claim. (Doc. 24.) In light of the Court's decision to strike the FAC, this portion of the motion to dismiss is moot and will be denied as such. However, the Court notes that this portion of the motion is functionally equivalent to Defendant's opposition to Plaintiff's Motion to Amend. *Gohier*, 186 F.3d at 1218. As such, the Court has considered the parties' briefing on the Second Motion to Dismiss in ruling on the Motion to Amend.

is futile if it "would be subject to dismissal"). The Court will address each of Defendant's arguments in opposition to the FAC's claims in turn.

      *1.*      *Plaintiff may include the Section 502(a)(1)(B) claim asserted in Count I when she refiles the FAC.*

Defendant first challenges Count I of the FAC, in which Plaintiff asserts a claim for benefits under ERISA Section 502(a)(1)(B). (Doc. 18 at 13-14; Doc. 24 at 6-9); 29 U.S.C. § 1132(a)(1)(B). Defendant argues that this claim is futile because Plaintiff has failed to plead that she exhausted, and in fact did fail to exhaust, her administrative remedies before filing suit. (Doc. 24 at 6-9.) Plaintiff counters that Defendant has not "defeat[ed]" any of the exceptions to ERISA's exhaustion requirement; it would have been futile for her to pursue exhaustion; the remedy provided was inadequate; and, Defendant denied her meaningful access to the review process in place. (Doc. 29 at 5-7.) For the reasons explained below, the Court finds Plaintiff has plausibly alleged facts that, accepted as true and viewed in her favor, would either excuse her from exhausting administrative remedies or require the Court to deem those remedies exhausted.

"The courts of appeals," including the Tenth Circuit, "have uniformly required that participants exhaust internal review before bringing a claim for judicial review under § 502(a)(1)(B)." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013); *see Held v. Manufacturers Hanover Leasing Corp.*, 912 F.2d 1197, 1206 (10th Cir. 1990) ("exhaustion of administrative (i.e., company- or plan-provided) remedies is an implicit prerequisite to seeking judicial relief" under Section 502(a)(1)(B)). In general, courts will excuse a claimant's failure to exhaust administrative remedies in "two limited circumstances," *i.e.*, "when resort to administrative remedies would be futile," and "when the remedy provided is inadequate." *Holmes v. Colorado Coal. for Homeless Long Term Disability Plan*, 762 F.3d 1195, 1204 (10th Cir. 2014); *McGraw v. Prudential Ins. Co. of Am.*, 137 F.3d 1253, 1263 (10th Cir. 1998). Also,

> [t]he Department of Labor added another exception to the exhaustion requirement when it amended the ERISA regulations in 2000 to provide that claimants are 'deemed to have exhausted' their administrative remedies if a plan has failed to establish or follow claims procedures consistent with the requirements of ERISA.

*Holmes*, 762 F.3d at 1204 (quoting 29 C.F.R. § 2560.503–1(*l* )). The Tenth Circuit has referred to this regulation as the "deemed-exhausted provision." *Id.*

There is no indication in the FAC that Plaintiff ever exhausted any Plan-provided review procedures, *e.g.*, by appealing Defendant's acts and omissions to the Johnson and Johnson Benefit Claims Committee within 60 days as described in the SPD.[9] (*See* Doc. 10-1 at 48; *see generally* Doc. 18.) Therefore, on the present record, Plaintiff has *not* plausibly alleged that she exhausted her administrative remedies. Nevertheless, Plaintiff's Section 502(a)(1)(B) claim is not subject to dismissal on this basis because she *has* plausibly alleged that she exhausted all of the administrative remedies Defendant made available to her, (Doc. 18 at 13-14), and has pled factual content supporting the application of the inadequacy exception and the deemed-exhausted provision to her claim.

First, Plaintiff has plausibly alleged facts showing that the inadequacy exception should apply. This exception "has been argued in circumstances where a plaintiff asserts that he or she received inadequate notice of the administrative remedies available, or how to pursue them." *Sawyer v. USAA Ins. Co.*, 912 F. Supp. 2d 1118, 1142 (D.N.M. 2012). As such, the Tenth Circuit has held that this exception does *not* apply where the "plaintiff received adequate, understandable

---

[9] The Court considers the SPD pursuant to Tenth Circuit caselaw holding that, on a motion to dismiss, courts may consider documents not attached to or specifically incorporated into the complaint if the complaint refers to the document, the document is central to the plaintiff's claim, and the defendant submits an indisputably authentic copy. *Prager*, 180 F.3d at 1189. However, the Court notes that the SPD may not describe the Plan terms in effect at all relevant times, for two reasons. First, Plaintiff alleges that her brother was entitled to benefits beginning in December 2015, but the SPD is dated July 2020. (Doc. 10-1 at 5; Doc. 18 at 4-5.) Second, "summary documents, important as they are, provide communication with beneficiaries *about* the plan, but … their statements do not themselves constitute the *terms* of the plan for purposes of § 502(a)(1)(B)," and thus these statements may not "necessarily … be enforced … as the terms of the plan itself." *CIGNA Corp. v. Amara*, 563 U.S. 421, 437-38 (2011) (emphases in original).

notice of [the ERISA plan's] review procedures and a full copy of the plan summary containing the review procedure provisions." *Rando v. Standard Ins. Co.*, 182 F.3d 933, at *3 (10th Cir. 1999) (unpublished).

Here, Plaintiff has plausibly alleged that Defendant failed to provide her with *any* notice of the Plan's review procedures or how to pursue them before she filed this lawsuit. (*See generally* Doc. 18.) Rather, she alleges that Defendant "denied Plaintiff her rights to request benefits on behalf of [Mr. Baca], and thereafter, became completely unresponsive." (*Id.* at 14.) She further alleges that neither of Defendant's written communications in response to her requests included any information at all about how to obtain internal review of Defendant's decisions.[10] (Docs. 18-4, 18-5.) And although Plaintiff and her counsel did allegedly receive oral instructions from the J&J BSC at various times, there is no indication that these instructions included information regarding the Plan's internal review procedures.

Moreover, the FAC indicates that Plaintiff first received a copy of the SPD when Defendant attached that document to its First Motion to Dismiss. (*See* Doc. 10-1 at 5-57; Doc. 18 at 11; Doc. 37 at 6.) And there is no suggestion in the record that Plaintiff or Mr. Baca would have received a copy of the SPD routinely as a deceased employee's surviving spouse or the surviving spouse's guardian and conservator. Therefore, Plaintiff has plausibly alleged sufficient facts to support her position that she should be excused from exhausting her administrative remedies because the remedy Defendant provided was inadequate. *Rando*, 182 F.3d 933, at *3; *Sawyer*, 912 F. Supp. 2d

---

[10] According to the FAC, Defendant sent no documents to Plaintiff before she filed suit; and, the only documents it sent to Mr. Baca in response to her requests were the federal tax withholding form and the Denial Notice. (Docs. 18-4, 18-5.) The Court considers these and other documents attached to the FAC pursuant to Tenth Circuit caselaw providing that, in evaluating a motion to dismiss, courts may consider not only the factual allegations in the complaint, "but also the attached exhibits and documents incorporated into the complaint by reference." *Commonwealth Prop. Advocates, LLC*, 680 F.3d at 1201.

at 1142.

In addition, Plaintiff has plausibly alleged facts showing that the deemed-exhausted provision should apply. This provision states that,

> in the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.[11]

29 C.F.R. § 2560.503-1(*l*)(1). The Tenth Circuit has limited application of the deemed-exhausted provision to instances in which a plan's failure to comply with Section 2560.503-1 "actually denied the [claimant] a reasonable review procedure." *Holmes*, 762 F.3d at 1213.

The plausible factual allegations in the FAC, accepted as true and viewed in Plaintiff's favor, show that Defendant failed to follow claims procedures consistent with 29 C.F.R. 2560.503-1. Looking first to Subsection (b) of the regulation, Section 2560.503-1(b)(3) provides that claims procedures must not be "administered in a way[] that unduly inhibits or hampers the initiation or processing of claims for benefits." 29 C.F.R. § 2560.503-1(b)(3). And, Section 2560.503-1(b)(4) prohibits claims procedures that "preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination," though "a plan may establish reasonable procedures for determining whether an individual has been authorized to act on behalf of a claimant." 29 C.F.R. § 2560.503-1(b)(4).

In the FAC, Plaintiff alleges facts supporting the reasonable inferences that (1) Defendant precluded her from pursuing a benefits claim on her brother's behalf even though she was his authorized representative, and (2) its procedures for determining whether she had been authorized

---

[11] The deemed-exhausted provision does not apply to certain "de minimis violations" of "[p]lans providing disability benefits," none of which apply here. 29 C.F.R. § 2560.503-1(*l*)(2).

to act on his behalf were unreasonable, in violation of 29 C.F.R. § 2560.503-1(b)(4). Most notably, Plaintiff alleges that Defendant refused to communicate with her regarding Mr. Baca's claim and forced her to seek appointment as his conservator to pursue a claim on his behalf, even though her appointment as his guardian already entitled her to do so.

Defendant suggests that it acted reasonably in requiring Plaintiff to be appointed as her brother's conservator "in light of the clear distinction between a guardian and a conservator under New Mexico law." (Doc. 25 at 4; *see also* Doc. 24 at 14.) In fact, however, the legal distinction is not nearly as stark as Defendant would have it. New Mexico law does indicate that a guardian "provide[s] for the care, custody or control of the person," while a conservator "manage[s] … property or financial affairs or both." N.M. Stat. Ann. §§ 45-1-201(A)(21), 45-5-101(A). However, New Mexico law also allows courts to grant guardians the power to "make financial decisions on behalf of the protected person," including to "compel any person under a duty … to pay sums for the welfare of the protected person to perform that duty," "receive money … deliverable to the protected person," "serve as advocate and decision maker … in any disputes … regarding the protected person's finances," and "obtain information regarding the protected person's assets and income." N.M. Stat. Ann. § 45-5-312(B)(4)(a)-(d). Here, Plaintiff has plausibly alleged that the state district court granted her these powers as Mr. Baca's guardian. (*See, e.g.*, Doc. 18-6 at 2.)

More broadly, Plaintiff alleges factual content supporting the reasonable inference that Defendant unduly inhibited or hampered the initiation or processing of her claim on her brother's behalf in violation of 29 C.F.R. § 2560.503-1(b)(3). *Inter alia*, Plaintiff alleges that Defendant ignored her counsel's August 2017 and June 2021 demand letters, even though by then she had been appointed as her brother's conservator in accordance with Defendant's April 2016 Denial Notice, and even though counsel faxed the June 2021 demand letter as the J&J BSC instructed.

(Doc. 18 at 6-10.) In short, Plaintiff has plausibly alleged that Defendant failed to follow claims procedures consistent with 29 C.F.R. § 2560.503-1(b).

Turning to Subsection (g) of the regulation, Section 2560.503-1(g)(1) requires plan administrators to "provide a claimant with written or electronic notification of any adverse benefit determination," which is defined as "[a] denial, reduction, or termination of, *or a failure to provide or make payment (in whole or in part) for,* a benefit." 29 C.F.R. § 2560.503-1(g)(1), (m)(4)(i) (emphasis added). The required notification must set forth the reasons for the determination, the plan provisions on which it is based, any additional information needed to perfect the claim, and "[a] description of the plan's review procedures and the time limits applicable to such procedures[.]" 29 C.F.R. § 2560.503-1(g)(1)(i)-(iv). Plan administrators must provide this notification within 90 days after receiving a claim, with one additional 90-day extension permitted if the administrator gives the claimant written notice of the extension before the original 90-day period expires. 29 C.F.R. § 2560.503-1(f)(1).

Accepting the well-pled factual allegations in the FAC as true and viewing them in Plaintiff's favor, Plaintiff has plausibly alleged that she requested payment of her brother's Plan benefits by contacting Defendant to "determine what was needed for distribution to start," requesting accommodations, and sending supporting documentation from December 2015 to April 2016. (Doc. 18 at 5-6.) She has also alleged that her counsel requested payment of her brother's benefits by mailing Defendant a demand letter in August 2017, and by contacting the J&J BSC and faxing another demand letter according to its instructions in June and July 2021. (*Id.* at 7-9.) Yet, according to the FAC, Defendant has never paid Plaintiff or her brother any benefits, and neither of its written communications in response to her requests included "[a] description of the

plan's review procedures and the time limits applicable to such procedures." 29 C.F.R. § 2560.503-1(g)(iv); (*see* Docs. 18-4, 18-5.)

Moreover, although Defendant argues that none of Plaintiff's requests can be construed as "claims" because "they were not sent to the correct address and did not actually state a claim for benefits," (Doc. 24 at 8 n.5), its arguments are unavailing at this juncture. As to its first point, Plaintiff alleges that the "correct" address—*i.e.*, the address provided in the SPD—was invalid. (Doc. 18 at 12.) Additionally, the SPD provides that a claimant can also "apply to begin … pension payments … by calling the Benefit Service Center," which Plaintiff specifically alleges she and her counsel did.[12] (Doc. 10-1 at 19; Doc. 18 at 5-9; *see also* Doc. 10-1 at 39 (beneficiary of employee who qualifies for pre-retirement survivor benefits "should contact the Benefit Service Center to commence payments").) And as to Defendant's second point, Plaintiff has more than adequately alleged that she and her counsel requested payment of Mr. Baca's benefits in their communications with Defendant. Plaintiff has therefore plausibly alleged that Defendant failed to provide her or her brother with timely and adequate notice of adverse benefit determinations as Section 2560.503-1(g) requires.

In addition to alleging that Defendant failed to follow claims procedures consistent with Section 2560.503-1(b) and (g), Plaintiff also plausibly alleges that these failures actually denied her and her brother a reasonable claims procedure, as required by Tenth Circuit law. *Holmes*, 762 F.3d at 1213. As already discussed, Plaintiff affirmatively alleges that Defendant "denied Plaintiff her rights to request benefits on behalf of [Mr. Baca], and thereafter, became completely

---

[12] Defendant's argument on this point presents two other problems, as well. First, as previously noted, the SPD attached to Defendant's First Motion to Dismiss is dated July 2020, which means that from 2015 to 2017, the "correct" claims submission address may have been different. (Doc. 10-1 at 5; Doc. 37 at 7.) Second, Defendant's argument assumes that Plaintiff was required to make a "claim" to initiate payments, but Defendant's September 1995 letter to Mr. Baca indicated that payments "will begin as of December 1, 2015," and did not instruct him to make a claim, or indeed take any action at all, to initiate them. (Doc. 18-1 at 1.)

unresponsive," even after she was appointed as Mr. Baca's conservator. (Doc. 18 at 14.) Defendant's alleged initial refusal to communicate with Plaintiff about her brother's benefits and subsequent failure to respond to her counsel's pre-litigation demand letters effectively denied Plaintiff access to any claims procedure at all.

In sum, in the FAC, Plaintiff has plausibly alleged that Defendant failed to follow claims procedures consistent with the requirements of Section 2560.503-1(b) and (g) and that its failures actually denied her and her brother a reasonable claims procedure. Thus, for purposes of her Motion to Amend, she should be deemed to have exhausted her administrative remedies. 29 C.F.R. § 2560.503-1(*l*)(1); *Holmes*, 762 F.3d at 1213; *cf. Cruz v. Reliance Standard Life Ins. Co.*, No. CIV 18-0974 RB/SCY, 2020 WL 7248102, at *2 (D.N.M. Dec. 9, 2020) ("Where there are time limits on the plan administrator's discretion and the administrator fails to render a timely decision, the claimant shall be deemed to have exhausted the administrative remedies by operation of law[.]") (quotation marks omitted). For this reason, and because Plaintiff has plausibly alleged facts supporting the application of the inadequacy exception as discussed above, the Section 502(a)(1)(B) benefits claim asserted in Count I of the FAC is not subject to dismissal for failure to exhaust or allege exhaustion of administrative remedies. The Court will allow Plaintiff to include this claim when she refiles the FAC.

> 2.    *Plaintiff must remove the liquidated damages claim from Count I before refiling the FAC, unless she is able to factually support it.*

Defendant also challenges the claim asserted in Count I for liquidated damages "pursuant to the terms of the ERISA SPD benefits contract." (Doc. 18 at 11, 14; Doc. 24 at 9 n.6.) In support of this claim, Plaintiff relies on the portion of the SPD providing that,

> if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and

> pay you up to $110 a day until you receive the materials, unless the materials were
> not sent because of reasons beyond the control of the administrator.

(Doc. 10-1 at 52; Doc.18 at 11); *cf.* 29 U.S.C. §§ 1024(b)(4) ("The administrator shall, upon written request of any … beneficiary, furnish a copy of the latest updated summary[] plan description, and the latest annual report[.]"), 1132(c)(1)(B) ("Any administrator … who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish … within 30 days after such request may … be personally liable … in the amount of up to $100 a day from the date of such failure or refusal[.]"). Defendant argues that this claim is futile because Plaintiff offers no basis for it.[13] (Doc. 24 at 9 n.6.)

The Court agrees with Defendant on this point. Nowhere in the FAC does Plaintiff allege that she requested "plan documents or the latest annual report" from Defendant, which Defendant then failed to provide within 30 days. (Doc. 10-1 at 52.) The only request for such documents alleged in or attached to the FAC is in counsel's December 2021 demand letter, which sought "all documentation related to and concerning the subject Plan."[14] (Doc. 18-10 at 1.) But Plaintiff filed the FAC only four days after this letter was written and one day after it was mailed. (Docs. 18-10, 18-11.) As such, she cannot rely on it to show that Defendant failed to respond to a document request within 30 days. In short, the portion of Count I seeking liquidated damages is futile and Plaintiff must remove it before refiling her FAC, unless she is able to add a specific, plausible, good-faith factual allegation to the effect that she requested one or more of the documents listed

---

[13] Defendant also argues that such an award is "discretionary" and requires a showing of "bad faith." (Doc. 24 at 9 n.6.) However, the discretionary nature of an award is not a basis for dismissing a claim under Rule 12(b)(6). And, the cases Defendant cites do not support the assertion that the award in question requires a showing of bad faith.

[14] Counsel's June 2021 demand letter did request "information regarding [Mr. Baca's] account including but not limited to, a payment history, all past due amounts accrued and ongoing monthly statements." (Doc. 18-8 at 3.) However, the SPD provision on which Plaintiff relies does not refer to documents of this kind. (Doc. 10-1 at 51-52.)

in the SPD, which Defendant then failed to provide within 30 days.

   3.     *Plaintiff may include the Section 502(a)(3) claims asserted in Counts II and III when she refiles the FAC.*

Defendant next challenges Counts II and III of the FAC. (Doc. 24 at 9-11.) In these counts, Plaintiff asserts claims for equitable relief under Section 502(a)(3). (Doc. 18 at 14-16.) Defendant argues that these claims are futile because they are duplicative of Plaintiff's Section 502(a)(1)(B) claim for monetary relief.[15] (Doc. 24 at 9-11.) Plaintiff responds that her Section 502(a)(1)(B) and (a)(3) claims are not duplicative and that she is entitled to seek "multiple forms of relief" under ERISA. (Doc. 29 at 7-8, 13.)

Section 502(a) sets forth "ERISA's civil enforcement scheme" and "consists of several carefully integrated provisions." *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1250 (10th Cir. 2004). Section 502(a)(1)(B) permits plan participants and beneficiaries to bring a civil action to recover benefits due, enforce rights, or clarify rights to future benefits under the plan's terms. 29 U.S.C. § 1132(a)(1)(B). Section 502(a)(3), in turn, authorizes a plan participant, beneficiary, or fiduciary to bring a civil action

> (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). In referring to "other appropriate equitable relief," Section 502(a)(3) "authorizes the kinds of relief typically available in equity in the days of the divided bench, before

---

[15] Defendant also argues that Counts II and III are futile because Plaintiff's Section 502(a)(3) claims are duplicative of her ADA claim. (Doc. 24 at 9-11.) However, Defendant has not cited to any authority prohibiting a plaintiff from asserting simultaneous Section 502(a)(3) and ADA claims, nor has it shown why its position is sound despite a lack of such authority. (*See id.*) Thus, for purposes of the present motions, Defendant has forfeited the point. *See Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him.") (brackets omitted).

law and equity merged." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 94–95 (2013) (quotation marks omitted). But Section 502(a)(3) does not "authorize appropriate equitable relief at large; rather, it countenances only such relief as will enforce the terms of the plan or the statute." *Id.* at 100 (quotation marks, citation, and emphases omitted).

As already noted in Section II.D.1, *supra*, Count I of the FAC sets forth a claim for benefits under Section 502(a)(1)(B). (Doc. 18 at 13-14.) Counts II and III, in turn, set forth claims for equitable relief under Section 502(a)(3) on the grounds that Defendant failed to administer the Plan in accordance with ERISA's requirements,[16] made misleading representations, and failed or refused to respond to Plaintiff's communications, thereby breaching its fiduciary duties.[17] (*Id.* at 14-16.) According to Defendant, "a plaintiff who may assert a proper claim for benefits under [Section 502(a)(1)(B)] … may not also assert a claim for those same benefits or related relief, veiled as 'equitable relief,' under [Section 502(a)(3)]." (Doc. 24 at 10.) Thus, Defendant argues, Plaintiff's Section 502(a)(3) claims are subject to dismissal because she "has simply restated her claim for benefits … under the guise of claims for 'breach of fiduciary duty.'" (*Id.*)

---

[16] The two ERISA provisions that Plaintiff alleges Defendant violated in Count II are 29 U.S.C. §§ 1055(a) and 1104(a). (Doc. 18 at 14-15.) Section 1055(a) requires pension plans to provide surviving spouses of vested participants with "a qualified preretirement survivor annuity." 29 U.S.C. § 1055(a)(2). Section 1104, in turn, requires plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries," "for the exclusive purpose of … providing benefits to participants and their beneficiaries [and] defraying reasonable expenses of administering the plan," and "in accordance with the documents and instruments governing the plan[.]" 29 U.S.C. § 1104(a)(1)(A), (D). As alleged in the FAC and described in the SPD, the Plan at issue does include a qualified preretirement survivor annuity for the surviving spouses of vested participants and therefore complies with Section 1055(a)(2). However, Plaintiff has alleged that Defendant did not administer the Plan "in accordance with" this provision in violation of Section 1104(a)(1).

[17] Neither Count II nor Count III includes an express request for the equitable relief Section 502(a)(3) authorizes. (Doc. 18 at 14-16.) However, in Count VII, Plaintiff makes a freestanding claim for injunctive relief, and in her Prayer for Relief she requests the traditionally equitable remedies of reformation, surcharge, restitution, prejudgment interest, a constructive trust, and an equitable lien. (*Id.* at 19, 21); *see CIGNA Corp. v. Amara*, 563 U.S. 421, 439-42 (2011) (suits by beneficiaries against plan fiduciaries are "the kind of lawsuit that, before the merger of law and equity, [beneficiaries] could have brought only in a court of equity," and "the remedies available to those courts," including reformation, surcharge, and restitution, "were traditionally considered equitable remedies").

The United States Supreme Court has not directly addressed whether courts must dismiss a plaintiff's claim for equitable relief under Section 502(a)(3) when she pleads a simultaneous claim for monetary relief under Section 502(a)(1)(B). *Christine S. v. Blue Cross Blue Shield of N.M.*, 428 F. Supp. 3d 1209, 1220 (D. Utah 2019). The Supreme Court did discuss the scope of relief available under Section 502(a)(3) more generally in *Varity Corp. v. Howe*, 516 U.S. 489 (1996) ("*Varity*"). In that case, a class of employees alleged that their former employer had lied to convince them to transfer their employment to a corporate subsidiary which then went bankrupt, causing them to lose their ERISA-protected benefits. *Id.* at 493-94. The class sued the former employer under Section 502(a)(3), "seeking the benefits they would have been owed … had they not transferred" their employment. *Id.* at 494. The pertinent question before the Court was whether Section 502(a)(3) "authorize[s] awards of relief to individuals," as opposed to "relief for the *plan*[.]" *Id.* at 495 (emphasis in original).

Answering this question in the affirmative, the *Varity* Court stated that Section 502(a)(3) "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Id.* at 512. The Court deemed it "unlikely" that its ruling would allow a beneficiary to "repackage his or her 'denial of benefits' claim as a claim for 'breach of fiduciary duty[,]'" thereby avoiding the deferential standard of review applicable to denial of benefits claims. *Id.* at 513-14. One reason it gave for finding this scenario improbable was its expectation "that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate[]'" within the meaning of Section 502(a)(3). *Id.* at 515.

The Supreme Court further elaborated on the scope of relief available under Section 502(a)(3) in *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011) ("*Amara*"). In *Amara*, a class of

24

employees sued to reform their employer's pension plan, alleging that the employer had changed

the plan's terms without adequate notice. *Id.* at 424-25. Finding in the employees' favor, the district

court relied on Section 502(a)(1)(B) to reform the plan and require the employer to pay benefits

accordingly. *Id.* at 425. The Supreme Court reversed, holding that Section 502(a)(1)(B) authorizes

courts to *enforce* a plan's terms, but not to *change* them. *Id.* at 436-38. However, the Court noted

that, on remand, the district court would likely wish to rely on Section 502(a)(3) to authorize the

relief previously awarded under Section 502(a)(1)(B). *Id.* at 438. As such, the Court addressed the

district court's expressed concern that Section 502(a)(3) might not support such relief. *Id.*

Discussing the scope of relief available under Section 502(a)(3), the *Amara* Court noted

that

> a suit by a beneficiary against a plan fiduciary (whom ERISA typically treats as a
> trustee) about the terms of a plan (which ERISA typically treats as a trust) … is the
> kind of lawsuit that, before the merger of law and equity, [a beneficiary] could have
> brought only in a court of equity, not a court of law.

*Id.* at 439. And, "the remedies available to those courts of equity," including contract reformation,

equitable estoppel, disgorgement of unjust enrichment, and surcharge, "were traditionally

considered equitable remedies." *Id.* at 440-42. The Court defined "surcharge" as "monetary

'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust

enrichment," and specifically observed that "the fact that this relief takes the form of a money

payment does not remove it from the category of traditionally equitable relief." *Id.* at 441.

Accordingly, the Court held that, "contrary to the [d]istrict [c]ourt's fears, the types of remedies

the court entered here fall within the scope of the term 'appropriate equitable relief' in § 502(a)(3)."

*Id.* at 442.

The Supreme Court remanded *Amara* to the district court to "revisit its determination of an

appropriate remedy" in light of the Court's opinion. *Id.* at 445. On remand, the district court found

that both reformation and surcharge were available forms of relief under Section 502(a)(3) and elected to grant the plaintiff class reformation. *Amara v. CIGNA Corp.*, 925 F. Supp. 2d 242, 251-65 (D. Conn. 2012). In addition, the district court awarded a plaintiff subclass prejudgment interest. *Id.* at 265. Holding that the district court did not abuse its discretion, the Second Circuit affirmed. *Amara v. CIGNA Corp.*, 775 F.3d 510, 532 (2d Cir. 2014).

Taken together, *Varity* and *Amara* establish a preference for Section 502(a)(1)(B) monetary relief as a *remedy* under ERISA. *See id.* and *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 959 (9th Cir. 2016), *as amended on denial of reh'g and reh'g en banc* (Aug. 18, 2016); *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 726 (8th Cir. 2014); *Christine S.*, 428 F. Supp. 3d at 1222. Pursuant to the Supreme Court's decisions, if a monetary remedy under Section 502(a)(1)(B) provides adequate relief, a plaintiff will not be entitled to receive equitable relief under Section 502(a)(3) for the same injury. *See Varity*, 516 U.S. at 512-14. However, *Varity* and *Amara* stopped well short of establishing a categorical rule that prohibits plaintiffs from pleading simultaneous *causes of action* under Section 502(a)(1)(B) and (a)(3). *Moyle*, 823 F.3d at 961; *Silva*, 762 F.3d at 726; *Christine S.*, 428 F. Supp. 3d at 1222.

The parties have not cited, and the Court's research has not uncovered, any Tenth Circuit decision discussing the propriety of pleading simultaneous causes of action under Section 502(a)(1)(B) and (a)(3) in the wake of *Varity* and *Amara*. *See Hancock v. Liberty Life Assurance Co. of Bos.*, No. CV 15-399 WPL/GBW, 2015 WL 12750281, at *5 (D.N.M. Aug. 24, 2015) ("The Tenth Circuit has not ruled on the impact of *Amara* on the ability of an ERISA claimant to bring both § [502(a)(1) and (a)(3)] claims."). The Tenth Circuit did, in a footnote in *Moore v. Berg Enterprises, Inc.*, state that the plaintiff in that case was "not entitled to repackage his denial of benefits claim as a claim for breach of fiduciary duty" under Section 502(a)(3) because, "under

the undisputed circumstances" of the case, Section 502(a)(1)(B) "provide[d] adequate relief." 201 F.3d 448, at *2 n.2 (10th Cir. 1999) (quotation marks, ellipses, brackets, and citation omitted). And in *Lefler v. United Healthcare of Utah, Inc.*, the Tenth Circuit held that "consideration of a claim under [Section 502(a)(3)] is improper when the [plaintiff], as here, states a cognizable claim under [Section 502(a)(1)(B)]" that "provides adequate relief" for the alleged injury. 72 F. App'x 818, 826 (10th Cir. 2003).

However, both *Moore* and *Lefler* were decided before *Amara*. Also, both of these unpublished decisions resolved appeals from district court rulings on summary judgment, rather than on the pleadings. *Moore*, 201 F.3d 448, at *2; *Lefler*, 72 F. App'x at 819. And, to read these decisions as establishing a categorical rule prohibiting parallel Section 502(a)(1)(B) and 502(a)(3) causes of action would be inconsistent with a later, published Tenth Circuit decision affirming a district court's award of benefits under Section 502(a)(1)(B) and prejudgment interest under Section 502(a)(3). *See Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1010, 1016-17 (10th Cir. 2008).

The decisions of other circuit courts of appeals also fail to provide definitive guidance on this question. In decisions issued before *Amara*, the First, Fourth, Fifth, Sixth, Seventh, and Eleventh Circuits all held that *Varity* barred plaintiffs from pursuing simultaneous claims under Section 502(a)(1)(B) and (a)(3); however, some of these cases were decided on summary judgment. *See LaRocca v. Borden, Inc.*, 276 F.3d 22, 28-29 (1st Cir. 2002) (summary judgment)*; Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 108 (4th Cir. 2006) (judgment on the pleadings); *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610 (5th Cir. 1998) (summary judgment)*; Mondry v. Am. Fam. Mut. Ins. Co.*, 557 F.3d 781, 805 (7th Cir. 2009) (summary judgment); *Katz v. Comprehensive Plan of Grp. Ins.*, 197 F.3d 1084, 1088-89 (11th Cir. 1999) (dismissal). Also, in

*Mondry*, the Seventh Circuit did allow the plaintiff to pursue a claim for restitution under Section 502(a)(3) "for the lost time value of the money she was forced to expend" on covered services pending a successful appeal on internal review, where she "could not have sought this form of relief under [Section 502(a)(1)(B)]." 557 F.3d at 805-06.

Following *Amara*, although the Sixth Circuit has disallowed "disgorgement of profits under § 502(a)(3) after the claimant recovered for wrongful denial of benefits under § 502(a)(1)(B)," *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 372 (6th Cir. 2015), the Second, Eighth, and Ninth Circuits have permitted plaintiffs to pursue simultaneous claims under Section 502(a)(1)(B) and (a)(3) past the pleadings stage. *New York State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 133-35 (2d Cir. 2015); *Silva*, 762 F.3d at 725-27; *Moyle*, 823 F.3d at 959-62. In the latter three cases, the courts held that, although ERISA plaintiffs cannot obtain duplicate *recovery* under Section 502(a)(1)(B) and (a)(3), they should be allowed to pursue simultaneous *causes of action*. *New York State Psychiatric Ass'n, Inc.*, 798 F.3d at 134; *Silva*, 762 F.3d at 726; *Moyle*, 823 F.3d at 961. In addition, the Second and Eighth Circuits noted that, at the motion-to-dismiss stage of the litigation, it was too early to tell whether Section 502(a)(1)(B) alone would provide an adequate remedy. *New York State Psychiatric Ass'n, Inc.*, 798 F.3d at 134; *Silva*, 762 F.3d at 727.

Having carefully considered the foregoing authority, the Court concludes that *Varity* and *Amara* do "not support a categorical rule to dismiss Section 502(a)(3) claims if the plaintiff also pleads a plausible Section 502(a)(1)(B) claim." *Christine S.*, 428 F. Supp. 3d at 1226. Rather, before rejecting a Section 502(a)(3) claim based on *Varity*, the Court must first determine whether the Section 502(a)(3) claim "repackage[s]" the Section 502(a)(1)(B) claim, *i.e.*, whether the claims are "actually duplicative," and whether the plaintiff's injuries would be "adequately remedied by

an award of money damages under Section 502(a)(1)(B)." *Id.* And, although there may be cases in which these two questions can be answered affirmatively on the pleadings, this case is not one of them.

As to the first question, claims are not actually duplicative if they assert alternative theories of liability or seek to remedy separate injuries. *Silva*, 762 F.3d at 726-28; *Christine S.*, 428 F. Supp. 3d at 1226; *cf. Mondry*, 557 F.3d at 804-06 (prohibiting plaintiff from pursuing claim for benefits under Section 502(a)(3) but allowing her to pursue lost time value of money she expended on covered services). Permitting the pleading of alternative theories of liability is consistent not only with *Varity* and *Amara*, but also with Federal Rule of Civil Procedure 8, which provides that "[a] party may set out 2 or more statements of a claim … alternatively or hypothetically, either in a single count … or in separate ones." Fed. R. Civ. P. 8(d)(2). It is likewise consistent with Federal Rule of Civil Procedure 18, which provides that a party "may join, as independent or alternative claims, as many claims as it has against an opposing party," and "may join two claims even though one of them is contingent on the disposition of the other[.]" Fed. R. Civ. P. 18(a), (b). Certainly, nothing in *Varity* or *Amara* purports to override either of these rules. *Silva*, 762 F.3d at 726.

Here, Plaintiff's Section 502(a)(3) claims rely on theories of liability alternative to those on which her Section 502(a)(1)(B) claim is premised or seek to remedy separate and distinct injuries. For example, Plaintiff asserts that Defendant violated ERISA or the Plan, *inter alia*, by refusing to allow her to act on her brother's behalf, ignoring her communications, failing to disclose material information, and making misleading representations. (Doc. 18 at 14-16; Doc. 29 at 8.) According to Plaintiff, this misconduct has resulted in a years-long delay in the submission and/or processing of her benefits claim. (Doc. 18 at 5-10.)

These allegations support a theory of liability that is alternative to the theory of liability underlying Plaintiff's Section 502(a)(1)(B) benefits claim. The theory underlying the benefits claims is, necessarily, that Plaintiff made a valid claim for benefits which Defendant wrongfully failed or refused to pay. 29 U.S.C. § 1132(a)(1)(B). Alternatively, however, her allegations could support the theory that she failed to make a valid claim until as late as December 2021 because Defendant's wrongful acts and omissions thwarted her prior attempts to do so.[18] Section 502(a)(1)(B) would provide no relief for any harm Defendant's acts and omissions caused in this scenario, but Section 502(a)(3) could, assuming Plaintiff also shows the requisite breach of fiduciary duty, applicable law, or Plan provision.[19]

Also, to the extent Plaintiff supports her Section 502(a)(3) claims by relying on the allegation that Defendant needlessly forced her to be appointed as her brother's conservator, (Doc. 18 at 7, 15), she asserts not only an alternative theory of liability, but also a wholly separate and distinct injury. Specifically, in this regard, Plaintiff alleges that Defendant not only hindered her efforts to make a claim, but also caused her to incur needless expenses to obtain the appointment. (*Id.* at 12; Doc. 18-7 at 2-3.) In sum, on the pleadings, Plaintiff's Section 502(a)(3) claims do not merely repackage her Section 502(a)(1)(B) claim and are not duplicative.

As to the second question the Court must consider under *Varity* and *Amara*—*i.e.*, whether an award of money damages under Section 502(a)(1)(B) would adequately remedy Plaintiff's injuries—it is too soon to say at this stage of the proceedings. Accepting the allegations in the FAC

---

[18] And indeed, Defendant specifically contends that Plaintiff failed to make a claim for benefits until December 2021. (Doc. 24 at 7-8.)

[19] Depending on how factual disputes are resolved, the harm Defendant allegedly caused by delaying Plaintiff's submission of a valid claim might include, for example, the lost time value of money, lost entitlement to benefits during the period of delay, or even—if the delay were to defeat the benefits claim altogether—loss of entitlement to any benefits at all. Notably, the lost time value of money is an injury for which Plaintiff cannot seek relief under Section 502(a)(1)(B). *Mondry*, 557 F.3d at 806.

as true, there remain undeveloped facts, such as the precise content of the parties' oral communications and the pertinent Plan terms,[20] that make it impossible to reliably predict whether Plaintiff has an adequate remedy at law. *See New York State Psychiatric Ass'n, Inc.*, 798 F.3d at 134 ("[I]t is not clear at the motion-to-dismiss stage of the litigation that monetary benefits under § 502(a)(1)(B) alone will provide [the plaintiff] a sufficient remedy."); *Silva*, 762 F.3d at 727 ("At the motion to dismiss stage, … it is difficult for a court to discern the intricacies of the plaintiff's claims to determine if the claims are indeed duplicative, rather than alternative, and determine if one or both could provide adequate relief."); *Christine S.*, 428 F. Supp. 3d at 1233 ("[H]aving district courts decide solely on the pleadings whether Section 502(a)(1)(B) may provide adequate recovery if a plaintiff prevails on her ERISA claims is an impossible task."); *see also Hancock*, 2015 WL 12750281 at *5 ("[A]t the pleading stage, it is preferable to allow alternative pleading where it is not apparent that adequate recovery exists under § [502(a)(1)], and instead decline duplicative relief as necessary later in the case.").

In conclusion, an ERISA plaintiff may not repackage a Section 502(a)(1)(B) claim for wrongful denial of benefits as a Section 502(a)(3) claim for equitable relief to avoid the deferential standard of review applicable to denial of benefits claims. Nor may a plaintiff obtain duplicate, equitable relief under Section 502(a)(3) when monetary relief under Section 502(a)(1)(B) would make the plaintiff whole. However, in her FAC, Plaintiff has pled alternative theories of liability and seeks to remedy separate and distinct injuries under Section 502(a)(3), and it is premature to determine whether she has an adequate remedy at law that would bar the equitable relief she seeks. Therefore, Plaintiff's Section 502(a)(3) claims are not subject to dismissal as duplicative of her

---

[20] As previously noted, the SPD does not indisputably establish the pertinent Plan terms because it is dated July 2020, (Doc. 10-1 at 5), and because summary plan descriptions do not necessarily "constitute the terms of the plan for purposes of § 502(a)(1)(B)." *Amara*, 563 U.S. at 438 (emphasis omitted).

Section 502(a)(1)(B) claim, and she may include the claims asserted in Counts II and III when she refiles the FAC.

4. *Plaintiff may include the Section 1133 claim asserted in Count IV when she refiles the FAC.*

Defendant next takes issue with Count IV of the FAC, in which Plaintiff asserts a claim under 29 U.S.C. § 1133. (Doc. 18 at 16-17; Doc. 24 at 11-12.) Section 1133 provides that, "[i]n accordance with regulations of the Secretary," ERISA plans must "provide adequate notice in writing to any … beneficiary whose claim for benefits under the plan has been denied," and "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary." 29 U.S.C. § 1133. In Count IV, Plaintiff alleges that Defendant violated Section 1133 because it:   (1) "failed to respond to Plaintiff's … correspondence requesting distribution of benefits"; (2) "did not provide any opportunity for Plaintiff to request a full and fair review" of Defendant's decisions; (3) failed to "properly accommodate Plaintiff based on the fact she was seeking to obtain benefits on behalf of … a disabled person"; and, (4) provided an incorrect address for the submission of written claims. (Doc. 18 at 17.)

Defendant argues that Count IV is futile because Plaintiff did not make a benefits claim until December 2021 and has not alleged that her claim has been denied. (Doc. 24 at 12.) Defendant's argument fails for two reasons. First, as discussed in Section II.D.1., *supra*, Plaintiff has plausibly alleged that, either personally or through counsel, she made a claim for benefits on Mr. Baca's behalf from December 2015 to April 2016, in August 2017, and from June to July 2021. Second, Defendant has presented no authority or argument to support the proposition that a protracted failure to pay benefits in response to a claim should be construed as something other than a denial. (Doc. 24 at 11-12.) For purposes of Plaintiff's Motion to Amend, Defendant has

therefore forfeited the point.[21] *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001).

Moreover, Section 1133 specifically provides that its requirements are "[i]n accordance with regulations[.]" 29 U.S.C. § 1133. As noted in Section II.D.1, *supra*, the regulations under ERISA regarding notice and internal review apply to "any adverse benefit determination," 29 C.F.R. § 2560.503-1(g)(1), (h)(1), including "a failure to provide or make payment … for[] a benefit[.]" 29 C.F.R. § 2560.503-1(m)(4)(*i*). And here, Plaintiff has clearly alleged that Defendant has failed to provide the benefits she requested. *Id.* For these reasons, the Section 1133 claim asserted in Count IV is not futile and Plaintiff may include it when she refiles the FAC.

   5.   *Plaintiff must remove the ADA claim asserted in Count V before refiling the FAC.*

Defendant next challenges Count V of the FAC, in which Plaintiff asserts a claim under Title III of the ADA. (Doc. 18 at 17-18; Doc. 24 at 12-15.) Title III "generally prohibits public accommodations from discriminating against individuals on the basis of disability." *Laufer v. Looper*, 22 F.4th 871, 874 (10th Cir. 2022); *Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1229 (10th Cir. 2016). Plaintiff contends that Defendant is a "public accommodation" within the meaning of Title III. (Doc. 18 at 17-18; Doc. 29 at 10-11.) Defendant disagrees, arguing that Plaintiff's ADA claim is subject to dismissal because, *inter alia*, "a benefit plan offered by a private employer is not a service provided by a public accommodation." (Doc. 24 at 13.)

In pertinent part, Title III of the ADA provides that

[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

---

[21] Likewise, Defendant has forfeited its contention that Plaintiff must allege bad faith to state a claim under Section 1133, by failing to offer any authority or argument in support. (*See* Doc. 24 at 11-12.)

42 U.S.C. § 12182(a).

The statute lists various types of "private entities" that "are considered public accommodations" for purposes of Title III. 42 U.S.C. § 12181(7). Among the numerous private entities Section 12181(7) lists by way of example are:

> a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy*,* insurance office, professional office of a health care provider, hospital, or other service establishment[.]

42 U.S.C. § 12181(7)(F); *see also Riggs v. Cuna Mut. Ins. Soc.*, 42 F. App'x 334, 335 (10th Cir. 2002) ("Title III of the ADA regulates places of public accommodation, including insurance companies.").

"Section 12181(7)(F)'s enumerated examples aren't exhaustive; rather, they serve as mere illustrations." *Levorsen*, 828 F.3d at 1230 (citations omitted). "Moreover, courts must construe § 12181(7)(F) liberally to afford individuals with disabilities access to the same establishments available to those without disabilities." *Id.* Thus, in *Levorsen*, the Tenth Circuit held that plasma-donation centers are places of public accommodation under Title III, even though they do not charge donors a fee in exchange for their services. *Id.* at 1229. "[S]ervice establishments are establishments that provide a service, regardless of whether they provide or accept compensation as part of that process." *Id.* at 1233-34.

Nevertheless, the Tenth Circuit has not addressed whether an employee benefit plan is the offering of a "public accommodation" under Title III, and the appellate courts that have done so have not spoken with a unified voice. In *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Association of New England, Inc.*, the First Circuit reviewed a district court decision holding that administrators of an employee medical reimbursement plan were not public accommodations because "the term 'public accommodation'" is "limited to actual physical

structures … which a person physically enters for the purpose of utilizing the facilities or obtaining services therein.'" 37 F.3d 12, 14, 18 (1st Cir. 1994). The First Circuit reversed, holding that places of public accommodation "are not so limited," and remanded "to the district court to allow plaintiffs the opportunity to adduce further evidence supporting their view" that the administrators were public accommodations under Title III. *Id.* at 19.

> In reaching this conclusion, the First Circuit reasoned that,

> [b]y including 'travel service' among the list of services considered 'public accommodations,' Congress clearly contemplated that 'service establishments' include providers of services which do not require a person to physically enter an actual physical structure,

because "[m]any travel services conduct business by telephone or correspondence[.]" *Id.* In the First Circuit's view,

> [i]t would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result.

*Id.*

> Notably, however, the First Circuit found it "unwise to go beyond the *possibility* that the plaintiff[s] may be able to develop some kind of claim under Title III" in light of the "sparse" allegations in the complaint and other ambiguities in the statute. *Id.* at 20 (emphasis in original). *Inter alia*, the court noted that,

> one could spend some time arguing about whether [Title III] is intended merely to provide access to whatever product or service the subject entity may offer, or is intended in addition to shape and control which products and services may be offered.

*Id.* at 19. The appellate court therefore declined to provide the district court with any "further guidance" on the plaintiffs' Title III claim on remand. *Id.* at 20.

The Third, Sixth, Seventh, and Ninth Circuits, in contrast, have held that an employee benefit plan is *not* the offering of a public accommodation under Title III of the ADA. *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 612 (3d Cir. 1998); *Parker v. Metropolitan Life Insurance Co.*, 121 F.3d 1006, 1010 (6th Cir. 1997); *Morgan v. Joint Admin. Bd., Ret. Plan of Pillsbury Co. & Am. Fed'n of Grain Millers, AFL-CIO-CLC*, 268 F.3d 456, 459 (7th Cir. 2001); *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000). In so holding, the Third, Sixth, and Ninth Circuits concluded that a "place of public accommodation" must always be a physical place. *Ford*, 145 F.3d at 612; *Parker*, 121 F.3d at 1010-14; *Weyer*, 198 F.3d at 1114-15. The Third and Sixth Circuits relied on the plain meaning of the term, as well as "the host of examples of public accommodations" in Section 12181, "all of which refer to places." *Ford*, 145 F.3d at 612; *Parker*, 121 F.3d at 1014.[22]

The *Ford*, *Parker*, and *Weyer* courts also concluded that limiting public accommodations to physical places is consistent with the premise that Title III prohibits discrimination in *access* to such places but not in the *content* of the goods or services they offer. *Ford,* 145 F.3d at 613; *Parker*, 121 F.3d at 1012; *Weyer*, 198 F.3d at 1115. Notably, the plaintiffs in these cases challenged the content of, rather than access to, the employee benefit plans at issue. *Ford*, 145 F.3d at 603; *Parker*, 121 F.3d at 1008; *Weyer*, 198 F.3d at 1107. More particularly, they claimed that the plans provided them with inferior benefits due to the nature of their disabilities. *Ford*, 145 F.3d at 603; *Parker*, 121 F.3d at 1008; *Weyer*, 198 F.3d at 1107.

Finally, although the Seventh Circuit reached the same result as the Third, Sixth, and Ninth Circuits, it rejected the argument that a public accommodation under Title III necessarily

---

[22] In *Weyer*, the Ninth Circuit cited to the *Ford* and *Parker* decisions with approval on this point but did not specifically reiterate their reasoning. *Weyer*, 198 F.3d at 1114-15.

"denot[es] a physical site." *Morgan*, 268 F.3d at 459. In the *Morgan* court's view, "[a]n insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell furniture to a disabled person who enters the store." *Id.*

Instead, the Seventh Circuit held that an employee benefit plan is not the offering of a public accommodation because "[w]hat matters is that the good or service be *offered to the public*." *Id.* (emphasis added); *cf. Parker*, 121 F.3d at 1014 ("Every term listed in § 12181(7) and subsection (F) is a physical place *open to public access*.") (emphasis added); *Carparts Distribution Ctr.*, 37 F.3d at 20 (noting "Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, *available indiscriminately to other members of the general public*") (emphasis added); *see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 680-81 (2001) (noting that privilege to compete in golf tournament, though "difficult" and "expensive to obtain," was "a privilege that petitioner makes *available to members of the general public*" in holding that Title III's protections applied to tournament competitor) (emphasis added).

The retirement plan at issue in *Morgan*

> was not offered to the public …. It was negotiated between the employer and the representative of its employees. No one could walk in off the street and ask to become a plan participant. The plan was a private deal, not a public offering.

*Morgan*, 268 F.3d at 459. The Seventh Circuit therefore rejected the plaintiffs' Title III claim. *Id.*

As noted above, the Tenth Circuit has not yet ruled on this question. And, in light of its admonition that "courts must construe § 12181(7)(F) liberally," *Levorsen*, 828 F.3d at 1230, the Court is disinclined to rely on the Third, Sixth, and Ninth Circuits' broad reasoning that a "place of public accommodation" must always denote a physical site. Further, unlike the plaintiffs in *Ford*, *Parker*, and *Weyer*, Plaintiff here is not challenging the Plan's *contents*; that is, she is not alleging that the Plan, by its terms, provided Mr. Baca with inferior or no benefits because of his

disability. Rather, she alleges that Defendant denied Mr. Baca *access* to the Plan and to the benefits to which he is entitled because of his disability. Thus, the Court cannot rely on the Third, Sixth, and Ninth Circuits' distinction between content and access discrimination.

However, the Court finds the Seventh Circuit's reasoning in *Morgan* persuasive. By its plain meaning, a "place of public accommodation" must accommodate the public. 42 U.S.C. § 12182(a); *Morgan*, 268 F.3d at 459. And, like the retirement plan at issue in *Morgan*, the Plan at issue here "was not offered to the public…. No one could walk in off the street and ask to become a plan participant." *Morgan*, 268 F.3d at 459. Rather, only otherwise eligible employees could participate in it. (*See* Doc. 10-1 at 9 (Plan covers eligible "employees").) To deem such a plan a public accommodation would drain the word "public" of any meaning.

Of course, not all members of the public will necessarily be eligible for a public accommodation's offerings, just as not all employees will necessarily be eligible to participate in an ERISA plan. For example, a hospital is unlikely to offer a patient contraindicated medical treatment, a private school will likely set admissions requirements regarding age and academic achievement, and a food bank may elect to provide food only to those who demonstrate need. *See* 42 U.S.C. § 12181(7)(F) ("hospital"), (J) ("private school"), (K) ("food bank"). Nevertheless, the covered entities listed in Section 12181(7) offer goods or services to otherwise eligible "members of the general public," *Carparts Distribution Ctr.*, 37 F.3d at 20, unlike an employee benefit plan, which, by definition, limits participation solely to otherwise eligible *employees*. Thus, like the Seventh Circuit in *Morgan*, the Court holds that the Plan is not the offering of a public

accommodation within the meaning of the ADA, and Plaintiff may not include a claim under this statute when she refiles her FAC because it would be futile for her to do so.[23]

      6.      *Plaintiff has plausibly named Defendant as a party in the FAC.*

Defendant next argues that the claims in the FAC are futile because it "is not properly named as a defendant." (Doc. 24 at 15.) In the FAC, Plaintiff alleges that at all relevant times Defendant was a Plan "fiduciary," "sponsor," and "administrator." (Doc. 18 at 2.) Defendant argues that these allegations are "conclusory," it "has no administrative or other control over the Plan," and the FAC's exhibits "do not reflect that [it] has control over the Plan." (Doc. 24 at 15.) Plaintiff counters that she has plausibly alleged Defendant has control over the Plan because the SPD lists "the Pension and Benefits Committee, Johnson & Johnson," as the plan administrator, the committee's address "is the same address as the defendant['s]," and it "is solely composed of appointed Johnson and Johnson employees." (Doc. 29 at 11-12; *see* Doc. 10-1 at 45-47.)

Both parties give rather short shrift to the law governing the question at hand. (Doc. 24 at 15; Doc. 29 at 11-12; Doc. 36 at 7.) Collectively they cite to just two cases, both of which stand for the proposition that the proper defendant in an action for benefits under Section 502(a)(1)(B) "is the party that controls administration of the plan," and "[i]f an entity or person other than the named plan administrator takes on the responsibilities of the administrator, that entity may also be liable for benefits." *LifeCare Mgmt. Servs. LLC v. Ins. Mgmt. Adm'rs Inc.*, 703 F.3d 835, 845 (5th Cir. 2013); *Cruz v. Lovelace Health Sys., Inc.*, No. 1:18-CV-974-RB-SCY, 2019 WL 4345971, at *3-*4 (D.N.M. Sept. 12, 2019). In other words, "the universe of ERISA defendants" under Section 502(a)(1)(B) consists of entities that "exert[] control over the benefits plan." *Cruz*, 2019 WL

---

[23] Because the Court holds that the Plan is not the offering of a public accommodation, it need not consider Defendant's other argument in opposition to Plaintiff's ADA claim, *i.e.*, that Plaintiff has not plausibly alleged discrimination on the basis of disability. (Doc. 24 at 13-15.)

4345971 at *4.

Notably, the parties cite to no authority regarding who is a plan fiduciary under Section 502(a)(3). (Docs. 24, 29, 36); *see generally* 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan or … has any discretionary authority or discretionary responsibility in the administration of such plan[.]"); *In re Luna*, 406 F.3d 1192, 1201 (10th Cir. 2005) (in addition to named fiduciaries, "individuals may acquire fiduciary status if they exercise the fiduciary functions set forth in … 29 U.S.C. § 1002(21)(A)"). Nor do the parties offer any nuanced legal argument regarding who may be a proper defendant under ERISA. (Docs. 24, 29, 36.) Rather, their dispute appears to be essentially factual, *i.e.*, whether it was Defendant that committed the alleged acts and omissions forming the basis of Plaintiff's claims.

Under Rule 12(b)(6), the Court must accept well-pled factual allegations as true and view them in the plaintiff's favor, *Schrock*, 727 F.3d at 1280, and this standard applies in the context of a futility argument in opposition to a motion to amend. *Gohier*, 186 F.3d at 1218; *Childs*, 781 F. Supp. 2d at 1251. Under this standard, and notwithstanding Defendant's contrary assertions, the factual allegations in the FAC (and the provisions of the SPD) support the reasonable inference that Defendant committed the acts and omissions alleged. The factual content supporting this inference includes that:

- Mr. Baca's deceased wife worked for Defendant from 1988 to 1994, (Doc. 18 at 4);

- The correspondence informing Mr. Baca of his entitlement to benefits came from the "Johnson & Johnson Benefit Service Center," as did the letter transmitting the federal tax withholding form, (Docs. 18-1, 18-4);

- The Denial Notice came from "Johnson & Johnson," (Doc. 18-5);

- Defendant attached the SPD to its First Motion to Dismiss, (Doc. 10-1; Doc. 18 at 11);

- The SPD identifies the "Plan Administrator" and "named Fiduciary" as "the Pension and Benefits Committee, Johnson & Johnson," which "is composed of employees of Johnson & Johnson who are appointed for indefinite terms by the Compensation and Benefits Committee of the Johnson & Johnson Board of Directors," (Doc. 10-1 at 45-46); and,

- The SPD provides that "[t]he Johnson & Johnson Benefit Service Center is responsible for the day-to-day administration" of the Plan. (*Id.* at 13, 47.)

In light of this factual content, it is reasonable to infer that Defendant, a corporate entity called "Johnson & Johnson International, Inc.," exerted control over the Plan and exercised discretionary authority or control over its management and administration and is therefore a proper party defendant with respect to Plaintiff's ERISA claims.

Of course, it is possible that Plaintiff has not named the correct "Johnson & Johnson" entity in the FAC. However, this is not an argument Defendant has explicitly made or supported.[24] Thus, Defendant has failed to meet its burden of showing futility on that basis. *Martin Marietta Materials, Inc.*, 953 F. Supp. 2d at 1181. Rather, accepting the allegations in the FAC as true and viewing them in the light most favorable to her, Plaintiff has plausibly alleged that Defendant is a proper party at this juncture.[25]

    7.    *Plaintiff may include the claims for declaratory and injunctive relief in Counts VI and VII when she refiles the FAC.*

---

[24] Nor has Defendant identified any entity that should have been named in its stead, even though its ability to produce a copy of the SPD suggests that, if it is not the proper corporate entity, it would be able to identify the entity that is.

[25] Of course, if in the exercise of due diligence Plaintiff learns that she should have named a different "Johnson & Johnson" entity, she may promptly seek Defendant's consent or the Court's leave to amend the refiled FAC to substitute the correct entity.

Finally, Defendant argues that the claims for declaratory and injunctive relief asserted in Counts VI and VII are futile because these claims "are largely duplicative of Plaintiff's claim for benefits in Count I" and "fail[] for the same reason," *i.e.*, for failure to exhaust administrative remedies. (Doc. 24 at 15-16; Doc. 36 at 7-8.) However, as discussed in Section II.D.1., *supra*, Count I is *not* subject to dismissal for failure to exhaust administrative remedies at this juncture, and thus neither are Counts VI and VII.

Defendant also argues that the duplicative nature of Counts VI and VII renders them subject to dismissal for the same reason the duplicative nature of Counts II and III renders those counts subject to dismissal. (Doc. 24 at 15-16.) But again, as discussed in Section II.D.3., *supra*, Counts II and III are *not* subject to dismissal as duplicative at this juncture, and thus neither are Counts VI and VII. In fact, it appears that Counts VI and VII specify *remedies* sought pursuant to the *claims* asserted in Counts I through III, and although this structure may be somewhat confusing, Defendant has not cited to any authority prohibiting it and has therefore forfeited the point. *Phillips*, 244 F.3d at 800 n.10. In short, Defendant has failed to show that Counts VI and VII are subject to dismissal for the reasons it has proffered. Plaintiff may include these counts when she refiles the FAC.

**E.    The Court will deny Plaintiff's Motion for Hearing**.

In her Motion for Hearing, Plaintiff asks the Court to set a hearing on her Motion to Amend. (Doc. 38.) However, in the Motion for Hearing, Plaintiff acknowledges that "[t]he factual and legal issues in connection with" the Motion to Amend "have been sufficiently briefed." (*Id.* at 1.) The Court therefore finds that a hearing on the Motion to Amend would not assist it. Plaintiff's Motion for Hearing will be denied.

### III.  Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED as follows:

1.      Defendant['s] Motion to Dismiss (Doc. 10) is DENIED AS MOOT;

2.      Defendant's Motion to Dismiss Plaintiff's First Amended Complaint for Declaratory, Injunctive, and Monetary Relief (Doc. 24) is GRANTED IN PART and DENIED AS MOOT IN PART;

3.      Plaintiff's First Amended Complaint for Declaratory, Injunctive, and Monetary Relief (Doc. 18) ("FAC") is STRICKEN;

4.      Plaintiff's Motion for Leave to File Plaintiff's First Amended Complaint (Doc. 30) is GRANTED IN PART and DENIED IN PART;

5.      Plaintiff may refile her FAC no later than **Thursday, May 26, 2022**. As refiled, the FAC must include the modifications this Order requires and may only include modifications that are either required or expressly permitted; and,

6.      Plaintiff's Motion to Set a Hearing Date (Doc. 38) is DENIED.

IT IS SO ORDERED.


_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent